**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAWN BALL,** | : | **Civil No. 1:10-CV-2561** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LT. BOWER, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.     Statement of Facts and of the Case

#### A.     Dawn Marie Ball's Litigation History

In many ways, Dawn Ball's current circumstances inspire continuing sorrow and concern.  Dawn Ball is an inmate housed in the Restricted Housing Unit at the State Correctional Institution (SCI) Muncy, who by her own account suffers from a cascading array of severe mental illnesses, and who has candidly acknowledged that she is profoundly disturbed.  Ball v. Beard, No. 1:09-CV-845 (Doc. 42, pp.6-7.) Furthermore, Ball is also an inmate who has reported to the Court that she engages in multiple episodes of destructive, self-defeating and senseless behavior.

Much of this institutional misconduct is marked by disturbing, excretory behavior.  Indeed, a constant refrain throughout many of Ball's lawsuits is her

1

fascination with her own bodily wastes. For example, recurring themes in Ball's lawsuits include Ball's penchant for smearing feces on herself, her clothes, her property, and her cell, as well as her destruction of her own clothing, and her use of her clothing to plug her toilet and flood her cell with water and human waste.

This case aptly illustrates Ball's bizarre predilections in this regard, since the undisputed evidence in this case includes prison surveillance video which show Ball repeatedly stripping, attempting to flood her cell with her discarded clothing, defecating, and smearing human waste on herself, her cell, and the cell surveillance camera. This case also illustrated another characteristic of Dawn Ball: Ball is also, by her own admission, an inmate with a propensity for sudden, explosive rages, as illustrated by the civil complaint which she has filed <u>Ball v. Barr</u>, No.1:11-CV-2240 (M.D.Pa.). In this complaint, Ball describes an episode in which a discussion regarding the aesthetic qualities of a piece of cornbread escalated in a matter of moments into a profanity-laced wrestling match over a food tray.

Ball is a prodigious federal court litigant, bringing numerous lawsuits based upon her perception of the events that take place around her in prison. Indeed, at various times Ball has had more than 25 lawsuits pending before this Court.[1] Ball is

---

[1]<u>See, e.g.</u>, <u>Ball v. SCI Muncy</u>, No.1:08-CV-700 (M.D.Pa.); <u>Ball v. SCI-Muncy</u>, No. 1:08-CV-701 (M.D.Pa.); <u>Ball v. Hill</u>, No.1:09-CV-773 (M.D.Pa.); <u>Ball v. Beard</u>, No. 1:09-CV-845 (M.D.Pa.); <u>Ball v. Lamas</u>, No. 1:09-CV-846,

also a prodigiously unsuccessful litigant, who has had numerous prior lawsuits dismissed either as frivolous, for failure to exhaust administrative remedies or on the grounds that the lawsuit failed to state a claim upon which relief could be granted. The history of repeated, frivolous and meritless litigation in federal court by this plaintiff has now led to court of appeals to conclude that Ball is barred as a frivolous filer under §1915(g)'s "three strikes" rule from proceeding *in forma pauperis* in federal court in the future. Ball v. Famiglio, 12-1067, 2013 WL 4038562 (3d Cir. Aug. 9, 2013).

## B. Ball's Current Lawsuit

### 1. Factual Background

It is against the backdrop of this history of unsuccessful, unexhausted and meritless filings that Ball instituted the current lawsuit on December 17, 2010. (Doc.

---

(M.D. Pa.); Ball v. Oden , No 1:09-CV-847 (M.D.Pa.); Ball v. Bower, No. 1:10-CV-2561 (M.D.Pa.); Ball v. Sisley, No. 1:11-CV-877 (M.D.Pa.); Ball v. Struther, No. 1:11-CV-1265 (M.D.Pa.); Ball v. Hummel, No. 1:11-CV-1422 (M.D.Pa.); Ball v. Beckley, No. 1:11-CV-1829 (M.D.Pa.); Ball v. Sipe, No. 1:11-CV-1830 (M.D.Pa.); Ball v. Craver, No. 1:11-CV-1831 (M.D.Pa.); Ball v. Powley, No. 1:11-CV-1832 (M..D.Pa.); Ball v. Cooper, No. 1:11-CV-1833 (M.D.Pa.); Ball v. Famiglio, No. 1:11-CV-1834 (M.D.Pa.); Ball v. Eckroth, No. 1:11-CV-2238 (M.D.Pa.); Ball v. Campbell, No. 1:11-CV-2239 (M.D.Pa.); Ball v Barr, No. 1:11-CV-2240 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-10 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-11 (M.D.Pa.); Ball v Curham, No. 1:12-CV-12 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-812 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-813 (M.D.Pa.); Ball v. Hummel, No. 1:12-CV-814 (M.D.Pa.); Ball v. D'Addio, No. 1:12-CV-815 (M.D.Pa.) .

1.)  Ball's *pro se* civil rights complaint, which was filed on December 17, 2010, provides a paradigm of the problems which seem to plague this inmate.  (Doc. 1.) According to Ball's complaint, these civil rights violations arose out of an extremely brief period of incarceration in the Lycoming County Jail on December 10, 2010. (Id.)  This period of imprisonment was exceedingly brief, as Ball acknowledges:  "I was only there for maybe 3 or 4 hours, tops." (Id.)  Yet, in that short span of time Ball managed to:  (1) become embroiled in a "belligerent" exchange with an unidentified male correctional officer who was inspecting her personal property; (2) indulge in a "nasty" discussion with an unidentified female correction officer; (3) become sufficiently disruptive that two other correctional staff, Lt. Bower, and Correctional Officer Rogers, were compelled to transfer her to the Special Management Unit at this county jail; (4) engage in an exchange of curses with these transporting officers; (5) become involved in a physical altercation in which Ball alleges that she was struck by the officers; and (6) find herself placed in a special management unit cell, where she alleged she was confined, naked, for approximately one hour. (Id.)

On December 17, 2010, Ball filed this *pro se* lawsuit, which recited this remarkable turn of events at the county prison and named six defendants:  the Lycoming County jail, the warden, Lt. Bower, Correctional Officer Rogers, and the two unidentified correctional officers as John and Jane Doe defendants.  Presently,

only Lt. Bower and Correctional Officer Rogers remain as defendants in this action.

With respect to these allegations, the undisputed facts can be simply stated: In December of 2010, Dawn Ball was a state inmate houses at SCI-Muncy. However, as a result of an incident occurring at SCI-Muncy, Ball was charged on December 2, 2009, in the Court of Common Pleas of Lycoming County to No. CR-979-2010 with Aggravated Harassment by Prisoner, Simple Assault and Harassment -Subject Other to Physical Contact ("Criminal Charges"). (Doc. 87, ¶Affidavit of Trisha Hoover "Hoover Affidavit" and Affidavit of Kevin A. DeParlos "DeParlos Affidavit".)

As a result of her alleged criminal actions at SCI-Muncy, Ball was transferred to SCI-Cambridge Springs, but was transported to the Lycoming County Prison ("Prison") on December 10, 2010, for pretrial proceedings. (Id., ¶¶2-5, Hoover Affidavit and DeParlos Affidavit.) Ball was incarcerated in the Lycoming County Prison for approximately 3 ½ hours on December 10, 2010, from noon until 3:26 p.m. (Id., ¶6, DeParlos Affidavit.)

From the outset of her arrival at the prison Ball was uncooperative, disruptive and combative, acting out initially in the Prison Intake Department by swearing at and threatening the Intake Officer. (Id., ¶¶7, 9.) As a result of Ball's disruptive behavior, the Intake Officer called Sergeant Bower to the Intake Department. Sergeant Bower, together with Corrections Officers Rogers and Wheeland then

5

handcuffed and escorted Ball to the Female Special Management Unit ("SMU"). (Id., ¶¶11-12, DeParlos Affidavit).  The SMU is equipped with a video camera which feed can be viewed on monitors in the Sub Control and in the Central Control of the Prison, and much of what then transpired was captured on video by prison officials. (Id., ¶13, DeParlos Affidavit).  That video shows that, as Ball was escorted into her SMU cell, she bore no signs of injury or any use of excessive force by correctional staff.  Her features were clear and unmarked, her eye glasses were intact, and her gait and posture disclosed no indication that any form of undue force had been used against her.  (Id., ¶¶14-18.)

Once Ball reached the SMU cell, she was put inside the cell, the door was closed and her handcuffs were removed through the security wicket in the cell door. As Ball's handcuffs were removed, but before the security wicket was closed, Ball spat on Sergeant Bower, who did not respond in any manner but simply closed the security wicket without further incident.  (Id., ¶¶19, 20, 21, DeParlos Affidavit and Video Tape, slow motion review).

What then followed on video was graphic confirmation of the bizarre and self-destructive behavior that has marked much of Ball's life and litigation.  Almost immediately upon entering the SMU cell, Ball removed her bra, underpants and socks and flushed them down the toilet.  Ball then began biting and tearing her prison-

6

issued pants, conduct which compelled Officers Rogers, Wheeland and Sergeant Bower to order Ball to hand her pants through the security wicket. (Id., ¶¶22-24, DeParlos Affidavit and Video Tape.)

Ball complied with the order, but was continuously swearing and threatening the Officers and Sergeant Bower and additionally threatened to hurt herself. Consequently Ball was briefly removed from her cell into the vestibule while Officer Wheeland removed her mattress from the SMU cell to prevent further destruction of property, before returning Ball to the SMU cell and ordering her to hand over her shirt. (Id., ¶¶25-27. Deparlos Affidavit and Video Tape).

The surveillance video then captures yet another bizarre turn in Ball's behavior. Almost immediately after being returned to the SMU cell, Ball defecated near the cell door, threw feces under the door into the vestibule, and smeared feces on the video camera as well as her cell door window. (Id., ¶¶28-29, DeParlos Affidavit and Video Tape.) Officer Wheeland cleaned up the feces in the SMU vestibule and placed a Flooding Protective Device at the base of Ball's cell door in the event that Ball further attempted to flood her cell by plugging the toilet. In response, Ball pulled the Flooding Protective Device under her cell door and tore off a piece of the device. (Id., ¶¶30-31, DeParlos Affidavit and Video Tape.)

A short time later, Ball's state court criminal defense counsel, Attorney Hoover, came to the Prison to meet Ball. Hoover was escorted to the Female SMU vestibule and attempted to talk to Ball through the security wicket. Hoover observed that Ball was wearing her eye glasses in her cell, which did not appear to be bent or broken in any manner, and did not observe any marks on Ball's face or signs of injury. However, as Hoover attempted to discuss her state case Ball was cursing, yelling, screaming and crying, behavior which led Ball's counsel to immediately file a Petition for Psychiatric Examination to Determine Competency to Proceed and Legal Sanity with the Court of Common Pleas of Lycoming County questioning plaintiff's competency to stand trial. (Id., ¶¶32-42.)

Shortly after Attorney Hoover left the Prison, Officers Rogers, Stutzman and Wheeland, together with Sergeant Bower, went into Ball's SMU cell, handcuffed her, removed her to the vestibule, and cleaned the feces from the video camera and cell door window. (Id., ¶ 44, DeParlos Affidavit and Video Camera). While the Officers were cleaning Ball's SMU cell, Ball was standing against the wall in the vestibule in an isolated location where other inmates could not view her. (Id., ¶¶45-47, DeParlos Affidavit and Video Camera).

After her cell was cleaned, Ball was placed back into the cell and her handcuffs were removed through the security wicket. Ball promptly repeated the bizarre

behavior she had previously exhibited, immediately defecating inside the cell door and throwing feces on the video camera, obscuring the video, while smearing human waste on the cell door window. (Id., ¶¶ 59-51, DeParlos Affidavit and Video Tape.) Officers Rogers and Wheeland, together with Sergeant Bower, then re-entered the vestibule and asked Ball to hand out her eyeglasses so that she could not use them to hurt herself. Ball complied and handed her eye glasses out through the security wicket, but remained combative and threatening. (Id., ¶¶52-53.)

Approximately 10 minutes later, while Ball had obscured the cell surveillance camera with her own human waste, staff found Ball standing on the sink with a piece of material tied around her neck which was tied to the air vent in her cell. After calling for backup on her radio, Officer Wheeland talked to Ball through the security wicket and convinced her to untie the material from around her neck. Ball was then removed from the cell into the vestibule, the material cut down, the video camera was once again cleaned, and Ball was returned to her cell. (Id., ¶¶ 54-57.) Shortly after this episode, Ball was removed from the county prison and transferred to SCI-Muncy. (Id., ¶58.) At no time does the video depict any use of undue use of force against Ball, any physical injuries to Ball, or any damage to her glasses. (Id., ¶¶59-67.)

## 2. Procedural History

On the basis of these uncontested facts, the defendants moved for summary judgment in their favor on December 3, 2012. (Doc. 85.) Ball, in turn, filed her own motion, which was in fact a response to this summary judgment motion, on February 6, 2013. (Doc. 98.) Accordingly, these motions are now ripe for resolution. For the reasons set forth below, we recommend that the defendant's summary judgment motion be granted.

## II. Discussion

## A. Rule 56–The Legal Standard

The defendants have moved for judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P., Rule 56. Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. <u>Id.</u> at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." <u>Berckeley Inv. Group. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see</u> <u>also</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay.

> See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003).
> The mere possibility that a hearsay statement will be admissible at trial,
> does not permit its consideration at the summary judgment stage. Henry
> v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is

insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, in a case such as this, where critical events at issue have been captured on videotape, the Court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. In fact, it is clear that, in this setting, we must view the facts in the light depicted by the videotape. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape."). This principle applies with particular force to inmate excessive force claims which entail videotaped encounters with staff. Where a videotape refutes an inmate's claims that excessive force was used against her, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate.

Tindell v. Beard, 351 F.App'x 591 (3d Cir. 2009).

## B.    **Constitutional Standards Governing Eighth Amendment Claims**

In conducting this legal analysis we must also be mindful of the constitutional standards which govern Eighth Amendment claims, since Ball advances an Eighth Amendment claim against the remaining defendants in his complaint alleging, with varying degrees of clarity, that prison staff violated her Eighth Amendment rights by using excessive force against her. This Eighth Amendment claim is judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction, but are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

Resolution of an Eighth Amendment claim, therefore, "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000)

With these tenets in mind we turn to a consideration of the Eighth Amendment claims advanced here by Ball. At the outset, Eighth Amendment excessive force claims entail a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson

v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining **"whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm,"**

Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that [s]he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Moreover, in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim. Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

Further, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated:

"In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

## C. The Defendants Are Entitled to Summary Judgment

### 1. Ball's Excessive Force Claims Fail

Guided by these benchmarks, we conclude that the defendants are entitled to summary judgment in this case on Ball's Eighth Amendment excessive force claims since the immutable witnesses, the videotape evidence, plainly "refutes [Ball]'s assertion that defendant[s] used excessive force," and we conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

Indeed, with respect to Ball's excessive force claims, there is nothing in the videotape depiction of this episode that could even remotely be characterized as in any way malicious or sadistic, the essential prerequisite to an Eighth Amendment violation. Quite the contrary, the video is striking and notable for the restraint exhibited by correctional staff, and for the care and attention which they give to Ball in the face of constant provocation by the plaintiff, coupled with bizarre excretory behavior. We must view the facts in the light depicted by the videotape, and may not

indulge in the"visible fiction" that Ball's version of events, which is plainly contradicted by the video, creates a genuine and disputed issue of fact.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").  Viewing these events through this analytical prism, and having carefully observed this videotape, it is simply impossible to say that any " reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically."  Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).  Therefore, summary judgment is appropriate here on behalf of all defendants as to this claim.

## 2. Qualified Immunity

But even if Ball had stated a colorable constitutional claim, the defendants would still be entitled to qualified immunity from these claims for damages.  In order to establish a civil rights claim Ball must show the deprivation of a right secured by the United States Constitution or the laws of the United States.  Satisfying these elements alone, however, does not guarantee that Ball is entitled to recover damages from these public officials.  Government officials performing "discretionary

functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have

committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and

award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment for an officer who claims qualified

immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005). Applying these benchmarks, and viewing the actions of correctional staff in the light depicted by the videotapes, we find that the defendants are entitled to qualified immunity in this case. Nothing in the measured and restrained conduct depicted in the videos could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, these officials should be entitled to qualified immunity from damages in this case.

## III.  Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment (Doc. 85.) be GRANTED, and Ball's motion to deny summary judgment, (Doc. 98.), be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is

made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 29th day of August 2013.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge